(No. 29859.— )

SOUTH SUBURBAN SAFEWAY LINES, INC., Appellee, *vs.* GOLD STAR LINES, Appellant.

*Opinion filed May 22, 1947.*

WILLIAM A. LEOPOLD, (CHARLES D. SNEWIND, of counsel,) both of Chicago, for appellant.

WETTEN, PEGLER & DALE, (PAUL N. DALE, of counsel,) both of Chicago, for appellee.

Mr. JUSTICE MURPHY delivered the opinion of the court:

South Suburban Safeway Lines is a public utility operating motorbuses for the carriage of passengers for hire. Its routes extend over a network of roads and streets from the central business district of Chicago on the north through and to several cities and villages to the south. It

will be referred to as Suburban. Gold Star Lines is also a public utility operating motorbuses from Joliet, Illinois, to Hammond, Indiana. The routes of the two companies extend over the same highways and streets from a point on U. S. highway No. 30 west of Chicago Heights to the intersection of State and Main streets in Dolton, a distance of approximately sixteen miles. Gold Star Lines will be referred to as Gold Star.

In 1944, Suburban filed a complaint with the Commerce Commission charging that Gold Star was transgressing upon Suburban's rights in hauling passengers over the common route whose point of origin and destination were within or at the termini of said common route. Issue was joined on Suburban's second amended complaint and evidence heard. The commission found that Gold Star had violated certain orders of the commission and entered a cease-and-desist order against it. A petition for rehearing was denied. On review by the circuit court of Cook county, the order of the commission was sustained. Gold Star has perfected an appeal to this court. No question arises as to the sufficiency of the service furnished the public by the two utilities but the controversy is limited to the rights of the respective parties to haul passengers over the common route. The matter is so devoid of public interest that the Commerce Commission has not filed a brief in this case.

Several years prior to the beginning of this action, the Commerce Commission, at various times, issued certificates of convenience and necessity to various companies permitting them to operate bus lines over the routes on which the parties are now operating. Some of them were issued as early as 1923. Such certificates have been the subject of transfer and assignment a number of times. In some cases the transfer was as to all rights acquired by the certificate, while in others the rights transferred referred to only a portion of the route described in the certificate. Over 1000 pages of record show the number of transfers

and assignments of certificates that were made during the years, all with the approval of the Commerce Commission, but the only ones necessary to be considered on this appeal are those which pertain to the interests acquired by Suburban and Gold Star in reference to the common route over which the questions arise. There is no dispute as to the fact that transfers were made and that the commission entered orders approving the same but there is a conflict of views as to the rights which the respective parties acquired by virtue of said transfers and orders.

Formerly Gold Star held a certificate of necessity and convenience to operate a bus line over a route beginning at the intersection of 111th Street and Michigan Avenue in the city of Chicago and extending in a southerly direction terminating at the intersection of Halsted street with Illinois street in Chicago Heights. Such route was through a number of suburban cities and villages south of Chicago and for purposes here it should be noted that it included the route extending from the intersection of State and Main streets in Dolton to the intersection of Halsted street and Illinois street in Chicago Heights.

In June, 1936, Gold Star entered into a contract with Suburban the substance of which was that Gold Star, for a consideration of $8000, leased to Suburban all rights it had in said route under said certificate. It was agreed that the lease should continue until the full consideration had been paid. Paragraph 9 of the contract contained the agreement of Gold Star to ask permission of the Commerce Commission to withdraw its schedule of fares and agreed that upon sanction of the commission it would "abandon all local business over said route." The contract was approved by order of the commission, the pertinent part of which is: "It is further ordered that the authority granted by this order and the transfer and assignment of a certificate issued pursuant thereto does not prevent Gold Star Line from operating motor buses over the route above

described as a part of its operation under certificates of convenience and necessity owned and operated by it and not specifically assigned under this order, except that in the operation of said motor buses Gold Star Line is hereby expressly prohibited during the effective period of the contract hereby approved and also after the transfer of the parts of certificates of convenience and necessity above specifically authorized from carrying passengers or baggage whose points of origin and destination are both between the intersection of 111th Street and Michigan Avenue in Chicago and the intersection of Illinois and Halsted Streets in Chicago Heights."

On June 26, 1939, a supplemental agreement was entered into referring to most of the provisions contained in the original contract of June 20, 1936, and in effect it provided for converting what had been a leasing agreement under the former contract into a fully consummated transfer of the certificate which was to be subject to the approval of the commission. At that time Gold Star was operating a bus line from Joliet, Illinois, to Hammond, Indiana, and reference was made to the fact in the supplemental agreement by stating that Suburban had knowledge of Gold Star's operation between the points named. The paragraph concluded with the following: "And it is expressly, mutually agreed and understood that the parties of the second part (Gold Star) may continue such operations (Joliet to Hammond) but with the understanding that it will not do any local business over the routes herein agreed to be assigned." Both companies joined in a petition to the Commerce Commission asking for approval of the supplemental agreement. By order entered in No. 24782, the commission approved the supplemental agreement. The order entered on July 19, 1939, approving the supplemental agreement described the route covered in the assignment of the certificate as being along the following route: the intersection of 111th street and Michigan ave-

nue in Chicago, Illinois; south on Michigan avenue to 127th street; east on 127th street to Indiana avenue; south on Indiana avenue to Lincoln avenue, Riverdale; southeast on Lincoln avenue to State street, Dolton; south on State street through South Holland to Glenwood road; southwesterly on Glenwood road through Thornton and Glenwood to Halsted street; south on Halstead street to Illinois street in Chicago Heights. A material part of the order was as follows: "It is further ordered that the authority granted by this order and the transfer and assignment of the certificates hereinbefore referred to does not prevent Gold Star Line from operating motor buses over the route above described as a part of its operation under certificates of convenience and necessity owned and operated by it and not specifically assigned under this order, provided, further that Gold Star Line is hereby expressly prohibited, after the transfer and assignment of the parts of the certificates of convenience and necessity heretofore described, from carrying passengers or baggage whose points of origin and destination are both between the intersection of 111th Street and Michigan Avenue in Chicago and the intersection of Illinois and Halsted Streets in Chicago Heights."

The remaining part of the route traveled by both companies extends west from Chicago Heights to the intersection of U. S. highway 30 (Lincoln Highway) and 211th street, sometimes referred to as Olympian Way. The Illinois Central Railroad Company has a passenger station located on said route, a short distance east of the 211th street intersection and the facts set forth in the orders of the commission indicate that the passenger traffic between the railroad station and Chicago Heights is the principal prize involved on this part of the route.

In June, 1923, the Commerce Commission issued a certificate of necessity and convenience, No. 12957, to the Chicago Heights and Joliet Transportation Company au-

thorizing it to operate a bus line between Joliet and Chicago Heights. After setting forth some details in reference to the beginning point in Joliet and on certain highways, it specifies that the route shall continue to the intersection of Halsted street and Illinois street in the city of Chicago Heights. In 1933 Gold Star held certificate No. 14917 which described a route within the city of Chicago Heights which was in part described as the terminal of Halsted street and Illinois street as was contained in No. 12957. In December of the latter year, the Transportation company and Gold Star entered into a contract wherein parts of their respective certificates were the subject of negotiation. Both parties joined in a petition to the Commerce Commission asking approval of the contract. An order entered by the commission, February 15, 1934, approved the contract and detailed the rights accruing to Gold Star by virtue of the transfer of a part of the section formerly held by the Transportation company. It provided that Gold Star should, by reason of the commission's approval of the contract, have the right to operate a bus line between Joliet and the intersection of Lincoln Highway and Olympian Way, the latter point being described as "at a point west of and near the right of way of the Illinois Central Railroad Company." On this it was given the right to transport passengers between the city of Joliet and the Olympian Highway intersection. The order reserved unto the Transportation company "the sole, exclusive and only right and authority * * * to transport passengers between the said 211th Street station [Lincoln Highway and Olympian Way] of the Illinois Central Railroad Co. and the City of Chicago Heights * * * in both directions." It further directed that Gold Star had the right to pick up and transport passengers between points of origin lying between Joliet and the Olympian street station in all instances where the points of departure or destination of such passengers were between

Joliet and Chicago Heights or other points along the routes described.

On April 23, 1940, the Commerce Commission approved a contract of Suburban and the Transportation company for the transfer to the Suburban of the rights to operate over the route that was reserved in the contract with the Gold Star. In such order the route from Chicago Heights west beyond the Illinois Central station was described as follows: "Starting from intersection of Kedzie avenue (sometimes known as Olympian Way) and 211th Street, which is 14th Street of Chicago Heights extended west [U. S. Highway 30]: East on 211th Street [U. S. Highway 30] to Chicago Road; South on Chicago Road to Illinois Street; East on Illinois Street to Halsted Street."

The cease-and-desist order entered by the Commerce Commission on which this appeal was based, ordered that Gold Star cease and desist from transporting passengers for hire between the intersection of State and Main streets, or any other point in Dolton, and the intersection of Illinois and Halsted streets in Chicago Heights, in either direction, where the points of origin and destination lie at or between said points; and for that part of the common route extended to the railroad station, it was ordered that Gold Star cease and desist from transporting passengers between the 211th street station of the Illinois Central Railroad Company and any point in the city of Chicago Heights in either direction where the points of origin and departure lie at or between said last-mentioned points, and that it cease transporting passengers for hire in either direction between any other points lying intermediate between Dolton and the intersection of 211th street and Kedzie avenue (Lincoln Highway—U. S. 30 and Olympian way.)

Gold Star contends that an adjudication of rights in this case calls for a construction of the contracts by which the certificates of convenience and necessity were trans-

ferred and assigned. It is argued that such determination is a function of the judiciary and beyond the power and jurisdiction of the Commerce Commission. Suburban contends the contracts became merged in the orders of the commission and that the rights of the parties are to be determined from such orders, a determination which is within the power of the Commerce Commission. The line that divides judicial questions from determinations which may be made by an administrative body is well established. Without exploring the possibilities that might be developed by an examination of such question, we conclude that the Commerce Commission did not have the power or authority to enter the cease-and-desist order on which this appeal is based. Section 75 of the Public Utilities Act (Ill. Rev. Stat. 1945, chap. 111⅔, par. 79,) provides that whenever the commission is of the opinion that any public utility is failing or omitting, or is about to fail or omit, to do anything required of it by law, or by any order, decision, rule, regulation, direction or requirement of the commission, issued or made under the authority of the act, or is doing anything or about to do anything contrary to or in violation of law or any order, decision, rule, regulation or requirement of the commission issued or made under the authority of the act, the commission shall, in any such case, commence an action or proceeding in a court of record in the name of the People for the purpose of having such violation or threatened violation stopped and prevented either by *mandamus* or injunction. The statute directs that the final judgment entered in such an action shall either dismiss the proceeding or direct that the writ of *mandamus* or injunction issue and that it be made permanent as prayed for in the petition or in such modified form as will afford appropriate relief.

The prayer of the second amended complaint on which the case was submitted is determinative of the nature of

the proceeding. It will be observed there was nothing in the prayer that indicated a purpose of having the commission make Gold Star furnish a more efficient public service. It was limited to the protection of Suburban's rights under the certificate against the alleged transgressions of Gold Star. The evidence, other than the record evidence, pertained to Gold Star's carriage of passengers whose points of origin and destination were within or near the termini of the common route. On such evidence the commission found there had been a violation by Gold Star of the previous orders.

The orders of the commission approving the contracts transferring and assigning the certificates designated the particular parts of the routes being transferred and the right that each carrier of passengers acquired by virtue of the contract. It will be noted that the order approving the contract for the transfer of the certificate covering the route from a point in Chicago to Chicago Heights contained a provision forbidding Gold Star to carry passengers whose points of origin and destination were between the points of beginning at 111th street and Michigan avenue in Chicago and the intersection of Illinois and Halsted streets in Chicago Heights. This included that part of the common route that lies between Chicago Heights intersection and the intersection of State and Main streets in Dolton. The order approving the contract for the transfer of the certificate for the route extending from the intersection of U. S. Highway 30 and Olympian Way, near the 211th street crossing of the Illinois Central railroad to Chicago Heights was equally explicit. It is conceded that both companies were public utilities and therefore their right to operate bus lines over the streets and highways described in the certificates was circumscribed by the authority contained in the order of the commission approving the contract. If Gold Star violated the terms of the order,

it was the duty of the commission under section 75 of the Public Utilities Act to start court proceedings to prevent further violation.

Gold Star advances a theory that brings into question a construction of the orders of the commission. Attention is called to the language of the order which prohibits it from carrying passengers whose points of origin and destination "are both between the intersection of 111th Street and Michigan Avenue in Chicago and the intersection of Illinois and Halsted Streets in Chicago Heights." The cease-and-desist order of the commission from which the appeal has been taken restricts Gold Star from transporting passengers "where the points of origin and destination lie at or between" these points. It is contended that the cease-and-desist order is broader than the order confirming the contract and places special emphasis upon the meaning of the word "between." To illustrate the point, the example is given of a passenger boarding a Gold Star bus at the intersection of Sixteenth and Halsted streets in Chicago Heights (instead of the intersection of Illinois and Halsted streets as designated in the order) to ride to Dolton. It is contended that such a carriage is not a violation of the order since the point of beginning was at the Sixteenth street intersection instead of at the Illinois street intersection. The presence of such question does not remove the case from the applicability of section 75. The only authority Gold Star had to operate a bus line hauling passengers from any point along the route was such as might have been granted by the action of the commission. If it violated such orders it came within that part of section 75 which empowers the commission to take court action to prevent further violation of its orders. On the other hand, if it was undertaking to operate a bus line which in some particular was outside the scope of the authority granted by the commission, then it was operating "in violation of

law" as stated in the statute and was subject to court proceeding.

The legal effect of the cease-and-desist order entered by the commission was that it found Gold Star had violated its previous orders, certificates, or determinations and it proceeded to reaffirm the previous order by entering a cease-and-desist order. Such procedure was not authorized by the Public Utilities Act, and the order so entered was a nullity.

For a statement of the general principles which are applied herein, see section 223, in 43 American Jurisprudence, page 719.

The questions involved in this proceeding were not present in *Public Utilities Com. ex rel. Evansville Telephone Co.* v. *Okaw Valley Mutual Telephone Assn.* 282 Ill. 336, since there was a question in that case as to whether the telephone company was a public utility. Referring to sections 75, 78 and 79 of the Public Utilities Act, it was said: "While it is a part of its duty to prosecute violators of its rules and orders, as aforesaid, and for violations of the Public Utilities Act, the commission has no jurisdiction to entertain a prosecution before it of any party or parties failing or neglecting to obtain a certificate of convenience and necessity who are required to do so under said section 55. It simply has the right and is clothed with the duty to prosecute such parties in the proper courts, as provided in sections 75, 78 and 79."

Reference is made in Suburban's brief to cases where a cease-and-desist order was entered by the commission, but an examination of those cases discloses that the questions there presented were not the same as in this case. The cease-and-desist order of the commission was a nullity and the judgment of the circuit court affirming the same must be reversed. The judgment is reversed and the order of the commission set aside.

*Judgment reversed and order set aside.*